IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                                No. 09-CR-902 WJ

REYNALDO ROMERO-LEON,

    Defendant.

**MEMORANDUM ORDER AND OPINION DENYING DEFENDANT'S MOTION TO SUPPRESS**

THIS MATTER comes before the Court on Defendant Reynaldo Romero-Leon's Motion to Suppress Evidence (Doc. 28). After receiving complaints of unauthorized persons living at a certain residence as well as reports of illegal drug activity at the residence, Albuquerque police officers entered and searched the residence. Inside the house, the officers encountered the Defendant in possession of a firearm. The officers arrested Defendant and a grand jury charged Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A), and with being an alien in possession of a firearm, in violation of 18 U.S.C. § 924(a)(2). The Defendant then filed this Motion to Suppress, arguing that the warrantless search of the residence violated his Fourth Amendment rights. The Court subsequently held a hearing on this Motion on Wednesday, April 7, 2010. Because the officers had consent from the tenant of the residence to search the house, the Court DENIES the Motion to Suppress.

**BACKGROUND**

On March 11, 2009, members of the Albuquerque Police Department ("APD") and the

City of Albuquerque's Nuisance Abatement team traveled to a residence on Princess Jeanne Avenue in Albuquerque, New Mexico to talk with Ms. Virgen Garcia, the Section Eight[1] tenant, about complaints they had received.  Specifically, officers from the Nuisance Abatement unit had received complaints about unauthorized persons living at the residence.[2]  As part of their agreement with the City of Albuquerque, Section Eight fund recipients cannot allow any unauthorized persons to live in their residence; those who violate the terms of their agreement risk losing their Section Eight rent subsidy.  Separately, APD officers had received complaints about illegal drug activity at the house.[3]  On March 11th, four individuals arrived at Ms. Garcia's residence on Princess Jeanne—Detective Wickline, Detective Lovette, Officer Romero and a civilian housing code inspector.

When the officers arrived, they saw Ms. Garcia hanging laundry in the backyard.

---

[1] Section Eight (or the Housing Choice Voucher Program) is a federal housing program which provides rent subsidies to low-income renters and homeowners.

[2] Ms. Garcia's neighbor, Ms. Blackburn, emailed a complaint about unauthorized persons living at the residence to the Albuquerque Housing Authority on February 3, 2009.  Albuquerque Housing Authority, in turn, forwarded the complaint to the Nuisance Abatement unit where Detective Wickline received it.  That complaint did not mention any drug activity.
Detective Wickline testified that he had received a previous complaint several months earlier alleging that Ms. Garcia had unauthorized persons living with her.  At that time, Ms. Garcia was living at a different address on Dickerson Street.  Detective Wickline and another officer had traveled to Ms. Garcia's residence on Dickerson Street in response to the earlier complaint.  The officers spoke with Ms. Garcia, but did not enter or ask to search her house.  The earlier investigation was inconclusive.  Ms. Garcia denied this entire encounter, alleging that the police had never questioned her at the Dickerson Street address and that she had never encountered Detective Wickline before.

[3] Detective Wickline, who received the initial complaint about unauthorized persons from the Housing Authority, testified that he spoke with the neighbor after receiving the complaint.  During that conversation, the neighbor apparently expressed concern about drug activity in the house.  Independently, Detective Lovette had received information about possible drug activity at the Princess Jeanne residence.

Detective Lovette and the civilian housing code inspector remained in the front yard. Meanwhile, Detective Wickline and Officer Romero walked up to the gate by the side of the house which separated the front yard from the back yard. From the other side of the gate, Detective Wickline asked Ms. Garcia if he could speak with her about complaints he had received. She said "yes" and immediately began walking toward the back door of the house. The officers entered the back yard through the gate and followed her. Detective Wickline asked her if anyone else was in the house and she responded, "Yes, my boyfriend." As she approached the back door, she began walking faster and speaking loudly in rapid Spanish.[4] Detective Wickline asked her to stop or slow down, but she continued inside the house. According to Officer Romero, the only officer present who spoke Spanish, Ms. Garcia was trying to warn someone inside the house by shouting: "They are coming for you!" At one point, Officer Romero tried to get in front of Ms. Garcia and physically stop her from going forward. Ms. Garcia alleges that Officer Romero pushed her to the floor, while Officer Romero denies this.

When the two officers entered the main room of the house behind Ms. Garcia, they saw the Defendant lying on the couch with a baby on his chest. Detective Wickline immediately went to the front door to let the officers waiting in the front yard know that they were inside. While he was at the front door, Officer Romero approached the Defendant on the couch. What happened next occurred very quickly and the sequence of events somewhat unclear. The Defendant had been sleeping on the couch and had a black pistol either next to him or in his right hand. The Defendant awoke seconds before Officer Romero approached the couch. Officer Romero saw the firearm, the Defendant grabbed the firearm and raised it, and a struggle ensued

---

[4] Officer Romero testified that Ms. Garcia spoke a slightly different and more rapid dialect of Spanish which Officer Romero attributed to her Cuban background.

between the two. Detective Wickline ran to Officer Romero's aid and helped to free the baby from Defendant's grasp. Officer Romero and Defendant then continued to struggle over control of Defendant's firearm for approximately 30 seconds. At one point, while Defendant still held the gun, Officer Romero wrestled the gun around so it was pointing directly into Defendant's face and pulled the trigger. The gun did not fire. Officer Romero ultimately gained control of the gun.

The officers then handcuffed and arrested Defendant. After they secured the Defendant, they searched the house for evidence of drug activity or unauthorized persons living there. The officers found no evidence of drugs and no evidence that Defendant was living at the residence—no men's clothing, men's toiletries or other indicators of a permanent male presence.[5] Following this incident, a grand jury charged Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A), and with being an alien in possession of a firearm, in violation of 18 U.S.C. § 924(a)(2).[6]

## ANALYSIS

Defendant Romero-Leon filed this Motion to Suppress, alleging that Virgen Garcia never gave the officers consent to enter the house.[7] In response, the United States makes two

---

[5] The officers did find, however, another male who had been living at Ms. Garcia's residence for about six days.

[6] Defendant's immigration status is that of a previously deported felon. Because Defendant is from Cuba, however, he was never physically deported. Rather, Defendant checks in with his immigration officer every three months.

[7] In his Motion, Defendant makes an alternative argument that Ms. Garcia's consent was neither knowing nor voluntary because the officers fabricated the complaints of drug dealing in order to trick her into consenting. Defendant appears to have abandoned this argument because he did not raise it at the hearing. In any case, the evidence is clear that the officers did, in fact, receive complaints about drug activity. Furthermore, as discussed earlier, the officers did not

arguments. First, the United States asserts that Defendant has no "standing" to assert any Fourth Amendment rights because he did not reside at the Princess Jeanne address and therefore had no reasonable expectation of privacy there.[8] Second, the United States asserts that Virgen Garcia gave the officers knowing and voluntary consent to enter the residence. The Court will address each argument in turn.

I.     **Reasonable Expectation of Privacy**

In order to claim the protection of the Fourth Amendment, a defendant must first demonstrate that he personally has a reasonable expectation of privacy in the place searched. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citing *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978)); *United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991) ("In moving to suppress evidence, it is the duty of the moving party to show by a preponderance of the evidence that he/she was personally aggrieved by the alleged search and seizure because it invaded his/her subjective expectation of privacy which society is prepared to recognize as reasonable."). An individual clearly has a reasonable expectation of privacy in his own home. In some circumstances, an individual may have a reasonable expectation of privacy in the home of someone else. *Id.* at 89. For example, the Supreme Court has held that an overnight guest has the kind of reasonable expectation of privacy protected by the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990). On the other hand, a guest briefly present in another's home

---

reveal the specific nature of the complaints to Ms. Garcia when they asked for her consent.

[8] The United States characterizes this issue as one of "standing," but the Supreme Court has expressly and consistently rejected that rubric. *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998); *United States v. Gordon*, 168 F.3d 1222, 1226 n.2 (10th Cir. 1999). Rather, the Supreme Court has held that this inquiry "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Rakas*, 439 U.S. at 140.

for the sole purpose of conducting a business transaction does not have a reasonable expectation of privacy. *Carter*, 525 U.S. at 90. Generally, a defendant must show that he had an actual, subjective expectation of privacy in the place searched and that his expectation was an objectively reasonable one that society is prepared to recognize. *See Carr*, 939 F.2d at 1444; *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).

In this case, it is undisputed that Defendant does not live at the residence on Princess Jeanne.[9] However, Virgen Garcia testified that she and the Defendant were married in Cuba in a religious ceremony before they came to the United States in 1995. She identified the Defendant to the officers alternatively as her boyfriend and her husband. While the exact nature of their current relationship is unclear,[10] Defendant obviously plays a large role in Ms. Garcia's life. The couple have three children together and Defendant actively participates in the lives of the children. Besides paying monthly child support, the Defendant frequently visits the girls at home, attends their school activities, takes them on trips to the park, and helps out by delivering groceries and supplies to their home. Defendant possesses a key to the Princess Jeanne house. According to Ms. Garcia, the Defendant would stay at her home several times a week in order to watch the children while Ms. Garcia was at work. Ms. Garcia worked as a housekeeper and her schedule varied: sometimes she cleaned houses all day from 8:00 a.m. to 4:00 p.m. and other

---

[9] It is undisputed for purposes of this case, although the Court notes that the Albuquerque police certainly suspected that Defendant actually lived at the residence. That very suspicion prompted the police visit on March 11, 2009, as well as the earlier visit to Ms. Garcia's address on Dickerson street. Furthermore, the Court notes that Defendant probably *would have* lived at the Princess Jeanne residence if he could have done so without jeopardizing Ms. Garcia's ability to receive federal funding in the form of a Section Eight voucher.

[10] The Defendant submitted an affidavit stating that he "had an intimate relationship with Virgen Garcia on the 11th of March 2009." (Doc. 52).

times she cleaned office buildings in the evenings.  During these times, Defendant Romero would stay alone with the children at Ms. Garcia's house on Princess Jeanne.  On March 11, 2009, the day of the incident in question, Ms. Garcia had asked Defendant to come over and watch the baby while she took the older girls to school.

While there is no case law specifically on point, the Court finds that Defendant's relationship with Virgen Garcia and the children combined with his regular visits to their home give Defendant a reasonable expectation of privacy in the Princess Jeanne residence.  Ms. Garcia and the children clearly considered Defendant a part of their family.  The evidence shows that Defendant spent a significant number of his waking hours at the Princess Jeanne address—often without Ms. Garcia present.  In addition, Ms. Garcia had given Defendant a key to the home so that he could come and go freely.  Taken together, all these facts suggest that Defendant subjectively treated the house as his own, even though he did not permanently reside there.  Furthermore, given his familial relationship with Ms. Garcia and the children, the Court finds that Defendant's expectation was objectively reasonable.

The United States, citing *Minnesota v. Carter*, argues that Defendant does not have a reasonable expectation of privacy because he was only a short-term visitor in the home and allegedly never stayed overnight.  *Minnesota v. Carter* is inopposite, however.  In that case, police officers observed several defendants packaging cocaine in someone else's home.  The Supreme Court held that the defendants had no reasonable expectation of privacy because they "were essentially present for a business transaction and were only in the home a matter of hours.  There is no suggestion that they had a previous relationship with [the homeowner], or that there was any other purpose to their visit. Nor was there anything . . . to suggest a degree of acceptance into the household."  525 U.S. at 90.  By contrast, Defendant Romero-Leon was

present in Ms. Garcia's home in order to fulfill his family obligations, not to conduct a business transaction. Taking care of one's children, like staying overnight in another's home, "is a longstanding social custom that serves functions recognized as valuable by society." *Olson*, 495 U.S. at 98. Furthermore, unlike the defendants in *Carter,* the Defendant here clearly had a longstanding relationship with Ms. Garcia and had been regularly visiting the Princess Jeanne home for as long as Ms. Garcia had lived there. Finally, the fact that Defendant possessed a key suggests a significant degree of acceptance into the household. *See Jones v. United States*, 362 U.S. 257, 259 (1960) (holding that nonresident who possessed a key to the searched property had a reasonable expectation of privacy there). Ms. Garcia testified that she had given the Defendant permission to come to the house whenever he wanted. During the many hours that Defendant spent in Ms. Garcia's house alone with their children, Defendant had full authority to admit or exclude anyone he wished to the residence. *See Rakas v. Illinois*, 439 U.S. 128, 149 (1978) (noting significance of fact that defendant had dominion and control over the place searched and could exclude others from it). Considering all the facts and circumstances together, *see Carr*, 939 F.2d at 1445, the Court holds that Defendant had a subjective expectation of privacy in the Princess Jeanne residence and that his expectation was an objectively reasonable one. Accordingly, Defendant may claim the protections of the Fourth Amendment.

**II.     Consent**

The Fourth Amendment guarantees the right of individuals to be free from unreasonable searches or seizures. U.S. CONST. amend. IV. Generally, warrantless searches—in particularly warrantless searches of the home—are presumed to violate the Fourth Amendment subject to a few established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008). Relevant here, law enforcement officers may

search a home without a warrant with the voluntary consent of the homeowner or tenant. *United States v. Pikyavit*, 527 F.3d 1126, 1130 (10th Cir. 2008). Whether voluntary consent was given is a question of fact determined by the totality of the circumstances. *Id.* The government must "proffer clear and positive testimony that consent was unequivocal and specific and freely given. Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *United States v. Zubia Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (quotations omitted).

Here, the United States claims that Ms. Garcia, the undisputed tenant, gave the officers consent to enter her house. As evidence, both Detective Wickline and Detective Romero took the stand and testified that Ms. Garcia gave them unequivocal consent to enter the house. According to both officers, Detective Wickline asked Ms. Garcia if they could come inside and speak with her about some complaints they had received. She answered "yes" and immediately began walking toward the back door. The Defendant, on the other hand, argues that Ms. Garcia never gave consent. Ms. Garcia testified at the hearing that she never gave—and the officers never requested—permission to enter the house. According to her version of events, the officers barged into the backyard, accused her of selling drugs and pushed her into her house. The issue of consent, then, boils down to a question of credibility.

The Court finds that the two testifying officers—Detective Wickline, in particular—were credible on the issue of consent and that Ms. Garcia was not credible on that issue. The stories of the two officers agreed with each other, while no witness corroborated Ms. Garcia's story. Furthermore, as the United States points out, the officers had no reason to shove Ms. Garcia to the ground and barge into her house without asking permission. At the time they arrived on the scene, the officers did not suspect any exigent circumstances. Rather, they merely intended to

investigate complaints of unauthorized persons living in Section Eight housing as well as possible drug activity.  The Court sees no reason to credit Ms. Garcia's rather dramatic rendition of the facts.

In addition, Ms. Garcia was clearly not credible on some distinct issues.  For example, she testified that four officers entered her backyard and pushed her into the house.  Once inside the house, she saw five other officers entering through the front door.  When questioned about the numbers of police in her house, she further added to their numbers, testifying that at least nine officers came into her house without permission but that the street outside was also filled with police.  Both officers, on the other hand, testified that only four individuals were present that day—three officers and one civilian code inspector.  The Court doubts that the Albuquerque Police Department would have sent scores of officers to investigate nothing more than a neighbor's complaint of unauthorized persons living at a Section Eight residence.  In addition, Ms. Garcia testified that, when she signed the consent form after the search, the officers threatened her by saying: "If you don't sign, you're going to go to jail and [we're] going to take your daughter to the government and we're going to go get your other daughter at school." Again, the Court can think of no reason why the officers would have threatened Ms. Garcia in this manner.

Defense counsel argues that the two officers are not credible.  In particular, he argues that this Court should not credit Officer Romero's testimony because, in his police report filed after the incident, Officer Romero did not report dry firing the gun at Defendant.  While Officer Romero had verbally relayed the dry firing to his commanding officer immediately after the event, he did not include it in his incident report written a day later.  According to an internal affairs investigation conducted after this incident, Officer Romero's actions inside the house had

10

been proper but Officer Romero was at fault for failing to report the use of potentially lethal force. The Court does not believe that Officer Romero's failure to report dry firing the gun at Defendant makes his testimony any less credible. Officer Romero admitted that his report was "very poorly written" and "scrambled." He also testified that the struggle over the gun had shaken him up so badly that he sought out help from a psychologist and took several weeks off of work following the incident. The Court believes that Officer Romero's failure to report the use of potentially lethal force stemmed from being badly shaken up after the incident, rather than any intent to hide the incident from his superiors. Finally, even if this Court were inclined to discredit Officer Romero's testimony, the Court has no reason to similarly discount Detective Wickline's testimony.

There is no credible evidence in this case that Ms. Garcia's consent was anything but voluntary. According to the officers' rendition of the facts, the exchange with Ms. Garcia was respectful and courteous. While both officers had guns attached to their belts, neither officer ever used or threatened to use his weapon during the initial encounter in the backyard where they obtained consent to enter the house. Similarly, neither officer raised his voice or touched Ms. Garcia during that encounter. Accordingly, the Court finds that Ms. Garcia voluntarily consented to the officers entry of her home.

## CONCLUSION

Because Virgen Garcia voluntarily consented to the search of her home, the Defendant's Motion to Suppress is DENIED.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE